THE STATE v. FRANK BENSON, Appellant.—142 S. W. (2d) 52.

Division Two, July 3, 1940.

*Charles R. Bell* and *Ellis G. Cook* for appellant.

*Roy McKittrick,* Attorney General, and *Lawrence L. Bradley,* Assistant Attorney General, for respondent.

WESTHUES, C.—Appellant Benson was convicted in the circuit court of Nodaway county, Missouri, of murder in the second degree and sentenced to imprisonment in the penitentiary for a term of of twenty-five years. From the sentence he duly appealed.

The offense was alleged to have been committed on May 22, 1934. A detailed statement of the facts surrounding the homicide may be found in State v. Hamilton, 340 Mo. 768, 102 S. W. (2d) 642. Hamilton was convicted of being an accessory after the fact. He was charged with aiding appellant Benson in his escape immediately after the homicide. Hamilton's conviction was affirmed. Benson was later apprehended in the State of California and returned to Nodaway county for trial.

Hamilton and his three small children lived on a farm a short distance south of Maryville. The house on this farm was divided into two rooms by an unfinished partition. There was also a smokehouse on the premises. Other buildings thereon need not be mentioned. In the early part of May, 1934, appellant Benson, deceased, Larry Hays and Mrs. Bockelman came to the Hamilton farm and remained until the day of the homicide. After these parties arrived Benson and Hamilton slept in the smokehouse while Hays, Mrs. Bockelman and the children slept in the house. The State introduced evidence that while Benson and Hays were at the Hamilton home they made various journeys at night. This was emphatically denied by Benson. He testified that he did not go on these trips and was at the Hamilton home only three days. On the evening of May 21, Benson and Hays left in Hamilton's car. They returned about 3:00 or 4:00 A. M., May 22. Hays awakened Hamilton, who was in the smokehouse, and informed him Benson had been shot. They went to the house where some water was heated and attempted to treat Benson's gunshot wound, which was located in the back of his neck. It was suggested that a doctor be called, whereupon Hays and Mrs. Bockelman left in

a car for that purpose. They returned in about an hour, stating that they were unable to find a doctor. This trip of Mrs. Bockelman and Hays must be kept in mind, because the only point briefed by appellant pertains to a conversation had between Mrs. Bockelman and Hays while they were looking for a doctor. After this unsuccessful trip for aid Hamilton took Benson to Maryville to a doctor who dressed the wound. When Hamilton and Benson returned Hays and Mrs. Bockelman had retired, but were awakened by Hamilton and Benson who partook of a few drinks in the adjoining room. Hays inquired if they had seen a doctor and if the bullet had been removed. He was informed that they had seen a doctor but that the bullet was not found. It was then about 7:00 A. M.

Hamilton went about the place to do his chores and Benson went to the smokehouse to sleep. Within a few minutes Hamilton heard a shot and a woman screaming. He ran to the house where Mrs. Bockelman informed him that Hays had been shot and was dead. Hamilton testified at this trial and his evidence was about the same as it was at his own trial. He testified that Benson had a revolver in his hand and said:

"Get me out of here. I shot the dirty rat. He didn't shoot me accidentally and I didn't shoot him accidentally." Hamilton took Benson to Hopkins where he left him and then notified the officers. Mrs. Bockelman testified that Benson came into the room while Hays was sound asleep; that she was dozing but knew what was going on; that Benson said something about cigarettes, then came to the bed and shot Hays through the head while he was sleeping; that he, Benson, said to the witness:

"Look at the back of my neck—dig a hole and bury him in it. I am on my way."

The evidence of Hamilton and Mrs. Bockelman was sufficient to sustain a conviction of murder.

Benson pleaded self-defense. He denied making the statements with reference to the shooting as related by Mrs. Bockelman and Hamilton. He testified that on May 21, Hamilton informed him that Hays had said that the first time he, Hays, saw Benson talking to Mrs. Bockelman he was going to shoot Benson, and Hamilton advised him to leave; that he then gathered his clothing and started to leave but Hays persuaded him to stay. He further testified that that evening he and Hays went to St. Joseph, and on the return trip, while Hays was riding in the back seat, he, Benson, heard a shot and felt a blow on the back of his neck; that Hays drove the car the balance of the return trip to Hamilton's; that this was the only time he had ever been with Hays in a car at night. He testified that Hays and Mrs. Bockelman had two .45 caliber automatic pistols; that Hays had one of these guns on the trip to St. Joseph; that after he, Benson, had been shot Hays claimed that the gun was accidentally discharged.

Benson further testified that he had bought some cigarettes on his visit to the doctor and had left them on the trunk near the bed where Hays and Mrs. Bockelman slept; that he returned from the smoke-house for the purpose of getting these cigarettes; that he then noticed one of the guns and some other articles lying on the trunk. As to what happened immediately prior to the shooting Benson testified as follows:

"Q. . . . Tell the court and jury under what condition and what brought it about that you shot him? A. I was feeling around the things on the trunk. I was trying to find his package of cigarettes. While I was doing that Larry Hays rose up in the bed and said, 'you snooping, s——of a b——. I didn't kill you the other time, I will now.' He reached to the window, picked up the gun and I reached down, grabbed a gun off the trunk and shot Larry Hays.

"Q. Why did you do it? A. Because I was fearful he would shoot me again.

"Q. Were you fearful you would receive bodily injury and possibly death? A. Yes, sir.

"Q. What position was he in when he got the gun? A. He was in a sitting position."

The evidence disclosed that the bullet passed through Hays' head and struck the wall. The pillow and mattress bore no marks or evidence of having been touched by the bullet. If the evidence of Benson be true the homicide was justifiable on the ground of self-defense.

█ The State in its evidence in chief was permitted to introduce in evidence, over defendant's objection, the substance of a conversation which was alleged to have occurred between Hays and Mrs. Bockelman while they were in search of a doctor to treat Benson's gunshot wound. This conversation had reference to how Benson had been shot. Mrs. Bockelman was asked if Hays told her how Benson received the bullet wound in his neck, and the witness replied:

"He said they were quite a. ways from the Hamilton home and prowling a garage and Benson got shot and Benson said 'go away and let me stay here' and he pulled him in the car and came home."

The witness had stated previously in her testimony that she noticed some ill-feeling between Benson and Hays on the morning of May 21. It will be remembered that that was about the time Hamilton was alleged to have advised Benson to leave.

Appellant's only point briefed has reference to the admission of the alleged statement made by Hays to Mrs. Bockelman, above quoted. The State seeks to justify the admission of this evidence on the theory that it tended to show the state of mind or intention of Hays. A number of cases cited have been examined and we find that they do not support the State's contention. 1 Wharton's Criminal Evidence, page 685, sec. 437, cited by the State, reads as follows:

"Statements made by the victim of a crime, which are not part of

the res gestae, dying declarations, or threats, are hearsay and inadmissible, even though the declarant is dead. There is an exception to this rule in the case of declarations as to state of mind made by a deceased upon his departure to meet the defendant, . . ."

The statement alleged to have been made by Hays was not such a statement. It was a narration of a past event, made out of the hearing of the defendant, clearly not part of the res gestae, and under the circumstances self-serving on the part of Hays, made for the purpose of exculpating himself from blame with reference to the shooting of Benson. The rule announced by Wharton, above quoted, was considered at length in the case of State v. Perelli, 125 Conn. 321, 5 Atl. (2d) 705, 121 A. L. R. 1357, where the court had the following to say:

"The rule as laid down in the earlier cases justified the admission of testimony of a deceased witness as to his intentions on the ground that it was part of the res gestae (Douglas v. Chapin, 26 Conn. 76, 92; State v. Hayden, 1 Ky. Law Rep. 71; State v. Smith, 49 Conn. 376, 381) but was restated in the Journey case, 115 Conn. page 351, 161 Atl. page 517, as follows: 'A declaration indicating a present intention to do a particular act in the immediate future, made in apparent good faith and not for self-serving purposes, is admissible to prove that the act was in fact performed. It is admissible, not as a part of the res gestae, but as a fact relevant to a fact in issue.' This is in accordance with the more modern and better reasoned doctrine. [113 A. L. R. 288, note; 3 Wigmore, Evidence (2 Ed.) sec. 1725.] The rule itself is more important than the theory on which it is founded. [State v. Farnam, 82 Ore. 211, 161 Pac. 417, Ann. Cas. 1918A, 318.] The underlying, essential characteristic of all the numerous cases admitting such evidence (see the A. L. R. note, supra) is that the statement must refer to the intention, design or state of mind of the declarant. Those parts of the statements referring to the acts and intentions past and present, of the defendantss were pure hearsay as to them, made by a person not subject to cross-examination, and are not within the exception to the hearsay rule defined in the Journey case."

Applying that rule to the situation at hand it is evident that the evidence was inadmissible.

The State urges further that the evidence was harmless because it was an admitted fact that Benson had been shot. We cannot agree with the contention that the evidence was harmless. Benson claimed self-defense as a justification. He testified that Hays reached for a gun and said to him:

"I didn't kill you the other time, I will now."

If Benson was shot while prowling a garage then there was no other time as referred to in the alleged statement of Hays. So the hearsay evidence went to the heart of appellant's defense. It was very damaging and if inadmissible, prejudicial to the rights of ap-

pellant. The trial court at the close of the trial concluded that the evidence was erroneously admitted. An instruction was given the jury to disregard the evidence. Where incompetent evidence is admitted of a character highly prejudicial to the rights of the defendant, the error is generally not cured by a withdrawal instruction. [See State v. Martin, 229 Mo. 620, l. c. 640, 129 S. W. 881, l. c. 887; State v. Minor, 193 Mo. 597, l. c. 613, 92 S. W. 466, l. c. 469, 470.] We are of the opinion that the evidence was of such a character that we cannot say as a matter of law that the withdrawal instruction cured the error. The judgment is therefore reversed and the case remanded for trial. *Cooley* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.