**In the Interest of W.J.D. and H.R.D., J.D., Appellant.**

**No. 15296.**

Missouri Court of Appeals,
Southern District,
Division Two.

July 28, 1988.

Motion for Rehearing and/or Transfer
Denied Sept. 7, 1988.

Charles D. Curless, Lamar, for appellant.

MAUS, Judge.

This proceeding was initiated on March 28, 1987, by the petition of the juvenile officer. That petition alleged that W.J.D., a female child age four years eleven months, and H.R.D., a female child age eight years, in the custody of their father, were in need of care and treatment within the purview of § 211.031.1(1)(b). It specifically alleged that on March 23, 1987, a physical examination disclosed that W.J.D. was suffering from suspected sexual abuse and was in danger of personal harm. It further alleged H.R.D. resided in the same house and was also in danger of personal

harm. The trial court found it had jurisdiction under the cited subsection. It placed the children with their mother, subject to visitation and summer custody for two months by the father. The father appeals.

Unfortunately, the evidence of the children's background is sketchy. The marriage of the parents was dissolved at an undisclosed date. They were initially placed in the primary custody of their mother. The decree was modified and on June 5, 1986, they were placed in the custody of the father. The reason for the modification is not stated. Apparently the mother filed a subsequent motion to regain custody. This motion was heard and denied. That proceeding involved allegations of the father's sexual abuse of H.R.D. The children were examined by a social worker specializing in the treatment of sexually abused children. However, because of the mother's lack of funds, that social worker did not testify in the hearing upon the mother's motion.

Ten days after the father gained custody of the children, his then wife Patty died. During the father's working hours the children were cared for by baby-sitters. On Friday, March 20, 1987, the children went to the home of the mother for the Easter weekend. On Sunday, March 22, 1987, at approximately 10:30 a.m., the father got the children to take them to church. He returned them at approximately 6:00 p.m. W.J.D. immediately went into the bathroom and unsuccessfully tried to urinate. The mother found her genital area was bruised and swollen. There was blood on her panties. The mother testified she showed the panties to the father and he appeared extremely nervous. The father explained to her that W.J.D. fell on her foot.

On March 23, 1987, W.J.D. was examined by a doctor. His findings included the following: bruises around the vaginal area, a bruise on the left hip bone, a bruise on the back of the left upper thigh, a bruise on the front of the right upper thigh; the entire vaginal opening was red and bruised; and there was a laceration in the vaginal area. The doctor testified that absolutely those injuries were not caused by a fall on the heel of a shoe. In his opinion the child had suffered from blunt trauma to the vaginal area and had been sexually abused. It was necessary to use a catheter to permit the child to void.

Neither child was called as a witness. The examining doctor said W.J.D. would not discuss her injuries with him. She told her mother she fell on her shoe at the church. A child abuse specialist employed by the sheriff, interviewed both girls on March 27, 1987. W.J.D. told her that the father put his mouth on her vaginal area; he did so when bathing her. She reported other sexual acts by her father. H.R.D. also reported sexual abuse by the father.

The court ordered the children to be examined by a psychologist. This psychologist had seen the children in 1986. She testified in the 1986 hearing. She was paid for appearing as a witness by the father or his deceased wife. This psychologist was called as a witness in the 1987 hearing by the father. The father had employed her for counseling.

The psychologist interviewed the children three times. She stated, "When I saw her [W.J.D.] initially on the first visit in April, I saw many of the same characteristics that are also often found in children who have been through some sort of abuse." W.J.D. told the psychologist of oral sex and other sex acts by the father. At one time she talked about sexual abuse in the bathroom at the church. She said her dad had hurt her bottom. She also reported he touched her vaginal area when bathing her and touched her vaginal and anal areas in wiping her after she went to the bathroom. However, the psychologist reported that W.J.D. changed her stories. The psychologist could not recall the differences between the stories on the first visit and the second visit. However, the psychologist determined the child indulged in fantasies. Those fantasies included having leukemia, having chicken pox when her father hurt her bottom, and stopping a fight between her parents. The psychologist reported that on the third visit, when she confronted W.J.D. with a fabricated story, W.J.D. admitted she lied about the sexual abuse.

The psychologist summarized the differences between initial stories and the final story in the following manner:

A. The difference that I saw was that she switched from 'My dad has been terrible to me by doing all of these awful things and touching me' to 'My dad did the wrong thing by touching my bottom when he wiped me and when he bathed me.' So I saw her change her story from him performing oral sex and the belly grabber game to him touching her when he wiped her and when he bathed her.

The psychologist was of the opinion W.J.D. had been coached during the six days before being placed in a foster home on March 28, 1987. She again summarized, "My conclusion that she had not been sexually abused was based on the fact that there is a host of other behavioral problems that seem to be connected with her difficulty in providing accurate information." The psychologist had a report of the doctor's examination on March 23, 1987. She did not discuss the injuries reported with the girls. She could not explain the physical findings related in that report.

The mother called the child sexual abuse expert who had examined the children in 1985. The court excluded that expert's report because it was before the 1986 hearing and the issues it raised had been litigated. Along the same lines, the court barred questions of the psychologist concerning sexual abuse of H.R.D.

There was in evidence an undisputed report of a foster parent that W.J.D. masturbated excessively and engaged in provocative behavior. Without objection, the child abuse expert called by the mother stated this was a sign that the child had been sexually abused. Also without objection, this expert testified that children in foster care may change their stories to return to the home.

There was placed in evidence a videotape of a protracted interview of W.J.D. The tape was apparently made on April 2, 1987. It contains a variety of inconsistent statements made by W.J.D. She initially refused to draw a picture of her father because he was mean. She stated that her father had told her that sometimes little girls were killed. There was also an unclear reference to the father taking the children somewhere without telling their mother. Later in the tape the statements of W.J.D. included the following. The father slept with the two girls. He committed oral sex upon her and had done so at church. He touched H.R.D. He played 'belly grabber' with them.

The father testified. He denied any sexual abuse of the children. When first questioned, he had no explanation for the injuries to W.J.D. As far as he knew at the time, W.J.D. had difficulty in going to the bathroom on March 22, 1987, because of a urinary infection. When further questioned, he reported that he wiped W.J.D. after she went to the bathroom. He did sleep with the children. He also explained that W.J.D. told him that she was injured when she fell on her foot at the church. When asked if the mother had shown him the bloody panties of W.J.D. he said, "I don't remember."

At the conclusion of the hearing, the court initially delivered a lengthy lecture to the parents on their responsibilities. It admonished them to stop fighting over the children. The court orally stated that it found the children were not being properly cared for but "with regard to the allegation that there was a specific act of sexual abuse, no." The formal order taking jurisdiction of the children contained the following finding:

The Court after hearing testimony and receiving evidence doth find that the allegations of the petition have been established in that W.J.D. and H.R.D. are in fact otherwise without proper care, custody, and support; in that the natural father is in fact in no position to properly provide the necessary care for the above named children; the Court further finds that the father's conduct toward these female children is not acceptable in the area of sexual manners. The Court finds that the surroundings of these children, while in the father's physical custody, was detrimental to the welfare of these children; and resulted in the emotional

trauma to the said children; and that the Court has jurisdiction over these children pursuant to the provision of Section 211.-031.1(1)(b) RSMo.

The father's three points on appeal are appropriately summarized as follows:

I. The trial court erred in that the modification of custody of the children was in contravention of § 452.375.3 because the change of custody was on the basis of the age and sex of the children and that the parent to whom custody was changed was the mother.

II. The trial court erred in its finding of jurisdiction in that it specifically found the allegations regarding sexual abuse of W.J.D. were without a factual basis and there was no factual basis for the finding of jurisdiction.

III. The trial court erred in changing custody from the father to the mother 'because there was clearly no significant change of circumstances regarding the minor children or the custodian to warrant a change of custody', citing § 452.410.

■ The father's points demonstrate a misconception of the nature of this proceeding. It is not a disposition of a motion to modify. It is a proceeding brought by the juvenile officer for the welfare of the children. "It should also be noted that a petition invoking § 211.031 can only be filed by the juvenile officer; and the proceeding is predominantly an inquiry by the State rather than a contest between the vindictive parents seeking a divorce decree granting custody or a modification thereof." *State ex rel. Dubinsky v. Weinstein,* 413 S.W.2d 178, 182 (Mo. banc 1967). "[W]e rule that in a case properly coming within the provisions of § 211.031 the jurisdiction of the juvenile court supersedes and is paramount to the incidental jurisdiction which a divorce court may have over the custody of the child of the parties." *Id.* at 180–181. Also see *Feese v. Feese,* 613 S.W.2d 882 (Mo.App.1981). In a proceeding under § 211.031, the authority of the court is not governed by § 452.375.3 or § 452.410. Nor is its consideration of any issue or evidence limited by the fact of prior litigation between the parents.

■ These principles make it apparent that the father's points I and III have no merit. His only point that requires consideration is his assertion that the evidence was insufficient to support the finding of jurisdiction by the court. To support this assertion his brief relies upon arguments such as the following:

The record in this case is completely void of any evidence whatsoever to support any allegation that the children, while in the custody of Appellant, were without proper care, custody or support, and that even if there were such evidence, which there is not, there is nothing which would indicate that such lack of care, custody or support had arisen because Appellant had neglected to provide such care.

Finally, it seems in the instant case that the Trial Court has partially lost sight of its function in society. The Court, in its zeal to redeliver these two young female children back into the hands of the female parent, steamrolled over the apparently insignificant rights of the male parent.

In supporting this point the father ignores three applicable legal principles. First, the assumption of jurisdiction by the court was not dependent upon an express finding the father committed a specific act of sexual abuse upon W.J.D. on March 22, 1987. "While there was insufficient evidence to establish the source of the alleged abuse, we believe there was sufficient competent evidence for the court to assume jurisdiction for the protection of the child pursuant to § 211.031 RSMo 1978." *In re C.R.K. v. H.J.K.,* 672 S.W.2d 696, 698 (Mo. App.1984). "It was not necessary to prove, as in a criminal case, whether the parents actually inflicted the injury or whether such injury was inflicted by someone else." *In re D.L.W.,* 530 S.W.2d 388, 391 (Mo.App. 1975).

■ Second, the hearsay declarations of W.J.D. and H.R.D. could be considered for the truth thereof. This is true even though those statements do not fall within the

purview of § 491.075 and no attempt was made to establish the admissibility of the videotape under § 492.304. See *In Interest of S.M.*, 750 S.W.2d 650 (Mo.App.1988), in which those and other recently enacted statutes dealing with child sexual abuse are succinctly catalogued and discussed. Many such declarations of abuse were admitted without objection. Moreover, the father through the psychologist introduced hearsay statements by both girls. These included declarations of abuse by both girls and a retraction by W.J.D. "One cannot be heard to complain of the admission of testimony over his objection, where evidence of the same tenor has been admitted without his objection." *Anderson v. Burlington Northern Railroad Co.*, 700 S.W.2d 469, 476 (Mo.App.1985), *cert. denied*, 476 U.S. 1116, 106 S.Ct. 1974, 90 L.Ed.2d 657 (1986).

By his action and inaction, the father has waived his right to object to consideration of these hearsay declarations. *Castle v. Modern Farm Equipment Co.*, 729 S.W.2d 650 (Mo.App.1987). "Regardless of whether some of this testimony might have been excluded upon timely and appropriate objections or motions to strike, its probative worth and effect were for the trier of the facts, since it was received without such objection or motion." *In Interest of J.L.L.*, 402 S.W.2d 629, 634 (Mo.1966) (footnote omitted).

Further, such consideration of the hearsay declarations is supported by cases such as *In Interest of S.M.*, supra, and *In re Marriage of P.K.A.*, 725 S.W.2d 78 (Mo. App.1987). On five occasions either W.J.D. or H.R.D. or both related experiences of sexual abuse. With the exception of the retraction, these declarations were consistent. See *In Interest of S.M.*, supra.

The third principle has been expressed in the following manner: "The proposition that prior abuse of another child is a prima facie case of imminent danger to a sibling in the same circumstances to justify intervention by the court for removal of such child from his environment has been recognized and sustained in other jurisdictions." *In re A.A.*, 533 S.W.2d 681, 684 (Mo.App.

1976). Also see *In Interest of A.K.S.*, 602 S.W.2d 848 (Mo.App.1980).

■ The father's argument there is no evidence to support a finding of jurisdiction is not based upon a discussion of the evidence. That argument ignores the record. The testimony of the examining doctor was direct evidence of aggravated sexual abuse of W.J.D. The force of that testimony is not diminished by the conclusion of the psychologist that W.J.D. had not been sexually abused. In addition, as developed above, the hearsay declarations of W.J.D. and H.R.D. constitute direct evidence they were sexually abused. The retraction by W.J.D. does not destroy that evidence but is to be weighed in determining its probative value.

Further, the finding of jurisdiction need not be based upon direct evidence. "A trial court, functioning as a fact-finder, can draw all reasonable inferences from the evidence presented to it and can base its ultimate findings upon such reasonable inferences." *School Dist. of Springfield R–12, Etc. v. Transamerica Ins. Co.*, 633 S.W.2d 238, 249 (Mo.App.1982). Such an inference exists when the circumstances point to a conclusion with reasonable certainty. *Williams v. Cavender*, 378 S.W.2d 537 (Mo.1964). Circumstances may be such that the force of an inference is greater than direct testimony. Because of the nature of the conduct and the age of the victims, this is often true in cases involving child abuse.

Items of undisputed evidence in this case are the basis for compelling inferences that W.J.D. and H.R.D. had been sexually abused. For example, this is true of the fact W.J.D., five years of age, masturbates. Further, the father professed to believe his daughter's inability to urinate was due to a bladder infection. Yet, he could not remember if the mother showed him the daughter's bloody panties.

The judgment of the trial court assuming jurisdiction of the children is to be reviewed under the standards of *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). Also see *In Interest of B.B.*, 537 S.W.2d 682 (Mo.App.1976). Moreover, on appeal,

unless justice otherwise requires, this court shall dispose finally of the case and to do so may enter the judgment the trial court should have given. Rule 84.14.

■ As stated, the trial court orally announced it did not find "a specific act of sexual abuse", apparently referring to an act by the father at the church. It is not necessary to give extended consideration to whether or not this finding is erroneous. In the circumstances of this case, a basis for jurisdiction was otherwise established. W.J.D. suffered unexplained abuse while in the father's custody. *In re C.R.K. v. H.J.K.*, supra; *In re D.L.W.*, supra. If a finding this occurred is not encompassed in the general findings of the trial court, this court is firmly convinced such general findings are against the weight of the evidence. Further, the trial court expressly found the father's conduct was "not acceptable in the area of sexual manners." This is a clear finding the father was guilty of sexual misconduct toward these children. The trial court's judgment determining they were without proper care, custody or support is supported by clear and convincing evidence. The judgment assuming jurisdiction of the children is affirmed.

The father has also attacked the order of disposition. This court is authorized to "give such judgment as the court ought to give." Rule 84.14. Plain error affecting substantial rights may be considered, though not raised or preserved, when the court finds that a miscarriage of justice has resulted from that order. Rule 84.-13(c). In view of that rule, this court must review aspects of the order, including the portion granting the father visitation and temporary custody and two months summer custody. This is true even though the juvenile officer has not appealed. This is particularly appropriate "when it is remembered that [appellant's] brief here raises the issue negatively", *In re Duren*, 355 Mo. 1222, 200 S.W.2d 343, 346 (banc 1947), and the Juvenile Act is rooted in the doctrine of parens patriae, *In re F⸺ C⸺*, 484 S.W.2d 21 (Mo.App.1972). Cf. *Rasco v. Rasco*, 447 S.W.2d 10 (Mo.App.1969), in which the court of appeals reversed a por-

tion of a decree determining a child to be illegitimate even though that issue was not presented.

■ This court finds that portion of the order of disposition placing the children in the custody of the mother is supported by the evidence. It further is of the firm belief that the portion of the order of disposition granting the father unsupervised visitation or temporary custody and two months summer custody is against the weight of the evidence and constitutes a miscarriage of justice. Therefore, the order of disposition is modified to place the children in the custody of the mother and eliminate such visitation and custody of the father. As so modified, the order of disposition is affirmed. The cause is remanded for further proceedings as provided in the Juvenile Act.

FLANIGAN, P.J., and HOGAN and PREWITT, JJ., concur.